# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| LOUIS GEIGER, CHRISTINA GOMEZ, AMANDA HAYNES, PRISCILLA ESCARCEGA, and GARA BOOTEN, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) ) |
| Plaintiffs, | ) |
| v. | ) |
| | ) |
| CHARTER COMMUNICATIONS, INC., CHARTER COMMUNICATIONS, LLC, SPECTRUM MANAGEMENT HOLDINGS COMPANY, LLC, and TWC ADMINISTRATION LLC, | ) ) ) ) ) |
| Defendants. | ) ) ) ) |

Case No. CV 18-158-DMG (GJSx)

**ORDER RE PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION [39] AND CONDITIONAL CERTIFICATION UNDER 29 U.S.C. § 216(b) [40]**

This matter is before the Court on two motions filed by Plaintiffs Louis Geiger, Christina Gomez, Amanda Haynes, and Gara Booten:[1]  a Motion for Class Certification under Federal Rule of Civil Procedure 23 [Doc. # 39 ("Class Cert. Mot.")], and a Motion for Conditional Certification under the Fair Labor Standards Act ("FLSA") [Doc. # 40 ("Cond. Cert. Mot.").]  The matters are fully briefed.  [Doc. ## 56 ("Class Cert. Opp."), 57 ("Cond. Cert. Opp."), 61 ("Class Cert. Reply"), 62 ("Cond. Cert. Reply").]

# I.

# BACKGROUND

Defendants are branches of a national telecommunications conglomerate that provides internet, television, and telephone services to customers in the Southern California region.  [Doc. # 26 ("FAC") at ¶¶ 6-10.  They operate a customer support "dispatch" center in El Segundo, California where employee "dispatchers" answer incoming phone calls related to customer service and technical support from customers and other employees.  *Id.* at ¶¶ 3, 11, 21-23.  Although there are different levels of dispatchers, all dispatchers perform "basically the same job."  [Doc. # 39-5 ("Solis Depo.") at 81:23-82:1.]  Plaintiffs were among the "at least 299" dispatchers Defendants employed at the El Segundo location during the "four-year period prior to the filing of the Complaint in this action."  *Id.* at ¶ 3; [Doc. # 39-3 at 7.]

Plaintiffs claim, on behalf of themselves and a putative class, that Defendants' *de facto* policies, staffing shortages, and supervisory employees subjected them to unlawful working conditions.  Specifically, Plaintiffs claim that (1) they frequently had to forgo meal or rest breaks to cover for other dispatchers and continue to take calls, and (2) had to boot up their computers and open the computer programs necessary to do their job (which they claim could take up to 15 minutes) before clocking in, and close those programs and shut down their computers after clocking out.  As a result, Plaintiffs claim that Defendants unlawfully failed to pay them wages for all hours worked, failed to pay overtime premiums, failed to provide necessary meal and rest breaks, failed to furnish accurate wage statements,

---

[1] Priscilla Escarcega was originally a named Plaintiff, but she has since decided not to participate in this action.  [Doc. # 56-3 ("Carr Decl.") at ¶ 20.]

and failed to timely pay all wages earned upon separation.  Class Cert. Opp. at 1; Cond. Cert. Mot. at 1; FAC at ¶¶ 77-152.

## II.

## RULE 23 MOTION

Plaintiffs propose that the Court certify the following overall class under Rule 23:

> All persons who, at any time in the 4 years preceding the filing of this lawsuit through the date of final disposition or final judgment in this action, are/were employed by Defendants (one or more of them) as a non-exempt dispatcher in Defendants' El Segundo, California office ("Class Members").

[Doc. # 39 ("Notice of Motion") at 2.]  Plaintiffs also propose six subclasses—for their "late meal period," "second meal period," "rest period," "itemized wage statement," "waiting time penalties," and "off-the-clock" claims—which the Court will discuss below. Because Plaintiffs' wage statement and waiting time penalties claims are wholly derivative of their meal break, rest break, and off-the-clock claims, the wage statement and waiting time penalties claims' certification depends on whether the Court certifies the meal break, rest break, and off-the-clock claims.  *See* Class Cert. Mot. at 12-14.

### A.    Legal Standard

Federal Rule of Civil Procedure 23 provides the standard for certification of a class action.  Under Rule 23(a), class plaintiffs must satisfy the "numerosity, commonality, typicality and adequacy of representation" requirements.  *See Mazza v. American Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012).  If the four Rule 23(a) prerequisites are satisfied, class plaintiffs must also "satisfy through evidentiary proof" at least one of the three subsections of Rule 23(b).  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).  At issue here is Rule 23(b)(3)'s predominance and superiority standard.  Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other

available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Rule 23 is more than a pleading standard, and it requires the party seeking class certification to "affirmatively demonstrate his compliance with the Rule." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (internal quotation omitted). Thus, a court must conduct a "rigorous" class certification analysis. *Id.* at 350-51; *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 542–43 (9th Cir. 2013) ("Class certification is proper only if the trial court has concluded, after a 'rigorous analysis,' that Rule 23(a) has been satisfied."); *see also Comcast*, 569 U.S. at 33 (plaintiffs must "be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a)."). Frequently, the analysis "will entail some overlap with the merits of the plaintiff's underlying claim," and "sometimes it may be necessary for the court to probe behind the pleadings . . . ." *Dukes*, 564 U.S. at 351 (internal quotation omitted) ("[T]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action."). Indeed, "a district court *must* consider the merits if they overlap with Rule 23(a)'s requirements." *Wang*, 737 F.3d at 544 (internal quotations omitted).

But "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage," and "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013). Plaintiffs seeking certification bear the burden of establishing all the Rule 23 requirements. *Hanlon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).

**B.   Discussion**

**1.   Numerosity**

A putative class may be certified only if it "is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The numerosity requirement imposes

no absolute limitations; rather, it "requires examination of the specific facts of each case." *Gen. Tel. Co. of the Nw. v. EEOC*, 446 U.S. 318, 330 (1980).  Thus, while the Supreme Court has noted that putative classes of 15 are too small to meet the numerosity requirement, *id*. at 330 & n.14, district courts in this Circuit have found that classes with as few as 39 members met the numerosity requirement, *see Patrick v. Marshall*, 460 F. Supp. 23, 26 (N.D. Cal. 1978); *see also Jordan v. L.A. County*, 669 F.2d 1311, 1320 (9th Cir.) (noting, in *dicta*, that the court "would be inclined to find the numerosity requirement . . . satisfied solely on the basis of [39] ascertained class members"), *vacated on other grounds*, 459 U.S. 810 (1982).  "The Ninth Circuit has not offered a precise numerical standard; other District Courts have, however, enacted presumptions that the numerosity requirement is satisfied by a showing of 25–30 members."  *Slaven v. BP Am., Inc.*, 190 F.R.D. 649, 654 (C.D. Cal. 2000).

Plaintiffs have satisfied the numerosity requirements because Defendants admit that they employed at least 299 dispatchers at the El Segundo location during the class period. Class Cert. Mot. at 15; Ex. 1 ("Defendants' Interrogatory Responses") at 7.

## 2.   Adequacy

The Rule 23(a) adequacy determination turns on the answers to two questions:  "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). Similarly, Rule 23(g) requires courts to consider:  "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class."  Fed. R. Civ. P 23(g)(1)(A).  Defendants challenge both Plaintiffs' and their counsel's adequacy.

Plaintiffs' counsel are adequate representatives.  The court is not aware of any conflicts of interest or any other reason they will not prosecute this action vigorously.

Furthermore, Rhonda Wills has submitted a detailed declaration outlining her extensive experience prosecuting and defending class actions in the FLSA and California wage-and-hour law context. [Doc. # 39-2.] While Defendants may disagree with some of Plaintiffs' counsel's litigation tactics, these tactics do not rise to the level of misconduct necessary for a finding of inadequacy.

The named Plaintiffs are also adequate. Defendants argue that because Plaintiffs had not spoken to their lead counsel (although they had spoken to other lawyers at her firm), knew "nothing" about their claims, did not recognize legal documents, were not aware of another similar lawsuit, did not know who their co-plaintiffs were, and did not know they might be responsible for paying costs if they lose this lawsuit, the Court should find them inadequate under Rule 23(a). Class Cert. Opp. at 23. The adequacy requirement, however, is a low bar. Courts do not require class representatives to understand the legal intricacies of their claims, or be able to explain the significance of legal documents and decisions in other related actions, especially in complex areas like wage-and-hour law. *See Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 372 (1966); 1 Newberg on Class Actions § 3.67 (no requirement that the plaintiff have independent knowledge of legal basis for a claim). Nor do the deposition passages Defendants cite convince the Court that Plaintiffs are unprepared for or fail to understand their responsibilities as class representatives. If anything, the deposition process has prepared them further.

In sum, both Plaintiffs and counsel are adequate representatives.

### 3. Typicality, Commonality, and Predominance

Typicality requires a showing that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The purpose of this requirement "is to assure that the interest of the named representative aligns with the interests of the class." *Wolin*, 617 F.3d at 1175 (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique

to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Id.* (quoting *Hanon*, 976 F.2d at 508).

There is substantial overlap between the commonality test and the predominance tests, but "the [Rule] 23(b)(3) test is 'far more demanding.'" *Wolin v. Jaguar Land Rover North America, LLC*, 617 F.3d 1168, 1175 (2010) (quoting *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997)). This overlap plays out in a two-step analysis. The Court first determines whether common questions exist and then determines whether those issues predominate in a given claim. *CGC Holding Co., LLC v. Broad & Cassel,* 773 F.3d 1076, 1087 (10th Cir. 2014) ("we must characterize the issues in the case as common or not, and then weigh which issues predominate") (citing 2 William B. Rubenstein et al., Newberg on Class Actions § 4:49, at 195–96 (5th ed. 2012).

The commonality requirement is satisfied if "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury." *Dukes*, 564 U.S. at 349-50 (internal quotations omitted). The commonality inquiry depends on whether a claim is "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350. "Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Id.* Without "evidence that the entire class was subject to the same" policy or practice, "there is no question common to the class." *Wang*, 737 F.3d at 543.

If such common questions exist, the court then must engage in the "demanding" determination of whether those questions predominate over individual questions. *See Comcast,* 569 U.S. at 33. Rule 23(b)(3) "requires a court to find that the questions of law or fact common to class members predominate over any questions affecting only individual members." *Id.* In other words, the predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (internal citations and quotations omitted). This

requires "careful scrutiny" of "whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Id.* (internal citations and quotations omitted).

### i.   Plaintiffs' Meal and Rest Break Claims Lack Commonality and Predominance[2]

Plaintiffs first claim that Defendants' policies and procedures prevented them and the putative class members from timely taking their guaranteed meal and rest breaks. As a result of those violations, Plaintiffs contend that Defendants also (1) failed to provide them with accurate wage statements because those statements did not include owed compensation for the missed breaks, and (2) failed to timely pay separation wages because Defendants did not pay Plaintiffs their meal and rest break premiums when their employment ended.[3]

Plaintiffs concede that Defendants maintain written meal and rest break policies that comply with California and federal law. Class Cert. Mot. at 5-6, 9; [Doc. # 38-7

---

[2] Plaintiffs define their "late meal period sub-class" as:

> All Class Members who, at any time in the 4 years preceding the filing of this lawsuit through the date of final disposition or final judgment in this action, were required to start their first meal period later than the end of their fifth consecutive hour of work on days in which they worked at least 6 hours.

They define their "second meal period sub-class" as:

> All Class Members who, at any time in the 4 years preceding the filing of this lawsuit through the date of final disposition or final judgment in this action, were not permitted to take a second meal period on days in which they worked at least 10 hours.

They define their "rest period sub-class" as:

> All Class Members who, at any time in the 4 years preceding the filing of this lawsuit through the date of final disposition or final judgment in this action, were not provided legally compliant rest breaks by Defendants in violation of California Labor Code § 226.7.

Notice of Motion at 2-3.

[3] Plaintiffs define their "itemized wage statements sub-class" as:

> All Class Members who, at any time in the 4 years preceding the filing of this lawsuit through the date of final disposition or final judgment in this action, were not provided accurate itemized wage statements in accordance with California Labor Code § 226(a) and Industrial Welfare Commission Wage Orders.

("Employee Handbook") at 10.][4]  It is also undisputed that Defendants implemented a number of measures designed to ensure that employees took advantage of their meal and rest break time.  The El Segundo location used software that allowed a dispatcher to enter an "auxiliary code" into the telephone system before a scheduled break that would divert future incoming calls to other colleagues and preclude the dispatcher from receiving new calls during the upcoming break.  [Doc. # 57-1 ("Appendix of Declarations"), Ex. 11 ("Solis Decl.") at ¶ 16.]  Dispatchers also have monthly one-on-one meetings with supervisors that include a discussion of how well the dispatcher is adhering to her break schedule.  Appendix of Declarations, Ex. 11 ("Salino Decl.") at ¶ 11.  Supervisors "coach" dispatchers on how to take each break they earn and set a monthly "goal" of 90% adherence to the break schedule.  *Id.*  And supervisors and management also tell dispatchers directly that they have to take their meal and rest breaks.  [Doc. # 39-10 ("Geiger Depo.") at 143:16-21.]

Plaintiffs argue that, despite those written policies and day-to-day safeguards, Defendants enforced an unwritten, *de facto* policy of denying dispatchers meal and rest breaks and failing to compensate them for the missed breaks.   Class Cert. Mot. at 5-6; Class. Cert. Reply at 3-4; *see Brinker Rest. Corp. v. Superior Court*, 53 Cal. 4th 1004, 1040 (2012) (holding that an employer satisfies its meal and rest break responsibilities when it "relieves its employees of all duty, relinquishes control over their activities and permits them a reasonable opportunity to take an uninterrupted 30-minute break, and does not

___

They define their "waiting time penalties sub-class" as:

All Class Members who are no longer employed by Defendants, in that they quit or were discharged from employment, and who, at any time in the 4 years preceding the filing of this lawsuit through the date of final disposition or final judgment in  this action, were not paid all wages earned and owed in a timely manner as required by California Labor Code § 203.

Notice of Motion at 3.

[4] These policies state that:  (1) "[e]mployees working a shift of six (6) or more hours must commence their lunch break before five hours of their shift has elapsed"; (2) "an employee may not 'work through' or waive his/her right to mealtime break periods"; and (3) "[i]f you are a nonexempt employee in California, for every four (4) hours or major fraction of four (4) hours that you work, you are entitled to one 10-minute break.  Breaks are considered time worked and are not deducted from your time on the clock."

impede or discourage them from doing so," but that the "employer may not undermine a formal policy of providing meal breaks by pressuring employees to perform their duties in ways that omit breaks."). Their arguments fail, however, because they cannot show that the *de facto* policy—even assuming it exists—applied uniformly, or commonly, to all class members. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 (9th Cir. 2011) (commonality requires "evidence that the entire class was subject to the same" policy or practice). Nor can they show that any common questions about the policy would predominate over individual inquiries as to whom it affected.

Plaintiffs point to their own time records as evidence that Defendants' policy prevented them from taking breaks. *See* Class Cert. Mot. at 6 (citing [Doc. # 39-12 ("Booten Time Records"), 39-14 ("Geiger Time Records"), 39-15 ("Gomez Time Records"), 39-16 ("Haynes Time Records")]). But those time records only show *when* Plaintiffs clocked in and out—they do not establish *why* they delayed or failed to take breaks. The fact that Plaintiffs did not always take timely breaks, without a showing that Defendants prevented them from doing so or knowingly acquiesced in the practice, is not enough to show that any *de facto* break-denial policy applied to the named Plaintiffs, let alone the entire class. *See Brinker*, 53 Cal. 4th at 1040-41 ("Bona fide relief from duty and the relinquishing of control satisfies the employer's obligations"—the "employer is not obligated to police meal breaks and ensure no work thereafter is performed."). The time records, without more, therefore, do not amount to proof "in fact" of any policy at all, let alone proof that the policy applied to the entire class. *See Comcast*, 569 U.S. at 33.

Plaintiffs also claim that Defendants' "habitual" understaffing, and the resulting workload, was the reason for these missed breaks. Class Cert. Mot. at 5-6. One supervisor acknowledged that the call center had understaffing problems that "on occasion" prevented dispatchers from taking timely breaks. Solis Depo. at 114:8-21. But other evidence indicates that some of Plaintiffs' missed breaks were the result of their own decisions to skip breaks based on their own assessments of the "workload" and "coverage" on a day-to-day basis, rather than the result of any *de facto* policy. *See* Doc. # 39-9 ("Gomez Depo.")

at 66:8-67:24 (agreeing that before taking a break, she would "look at [her] team and make a determination as to whether [she] thought there was enough coverage" to "go ahead and take [her] break[.]"); Solis Depo: at 115:5-116-12 (stating that "[a] lot" of the missed breaks were because "the employees cho[se] to go later because they want to go when their peer goes or they have something that they want to do at a specific time."); *Cleveland v. Groceryworks.com, LLC*, 200 F. Supp. 3d 924, 946 (N.D. Cal. 2016) (the fact that employees "have skipped breaks of their own accord due to pressure they feel to complete their job in a given amount of time" is not enough to show an employer policy of denying breaks).   Similarly, other evidence shows that supervisors and management actively monitored and encouraged (and even provided monetary incentives for) Plaintiffs to take breaks in accordance with Defendants' written policies.[5]

In fact, Plaintiffs themselves indicated in self-evaluations and performance reports that they were able to take their breaks on time.  Geiger Depo. at 132:18-134:10 (in the "self-comment" portion of his performance review, Geiger stated that "I take my lunches and breaks on time."); Gomez Depo. at 103:25-104:22 (same); Booten Depo. at 183:8-18 (same).   There is no evidence in the record to show that employees were subject to retaliation if they admitted that they were not able to timely take their breaks.  This suggests that there was no universally-applied policy of denying breaks to all dispatchers because, even if some other, unidentified class members suffered as a result of the alleged *de facto* policy, Plaintiffs may not have been among them.   *See Dukes*, 564 U.S. at 350 ("Dissimilarities within the proposed class . . . have the potential to impede the generation of common answers."); *Dilts v. Penske Logistics, LLC*, 315 F.R.D. 591, 594 (S.D. Cal.

---

[5] Solis Depo. at 175:7-15 (describing a process by which dispatchers can inform supervisors that they are scheduled for a lunch break, but do not have coverage, so that supervisors could "reallocate coverage" and allow the dispatcher to take the break); Geiger Depo. at 135:18-22 (agreeing that "taking breaks and lunches on time" was "something that the company cared about," but stating that "that wasn't the norm."), 136:10-15 (agreeing that Defendants "monitored" and "scored" how well dispatchers adhered to their break schedule), 178:11-20 (agreeing that when he would "fail to comply" with his break schedule, his supervisors would "talk to [him] about that and tell [him that he] need[ed] to comply with [his] schedule" and "stress to [him] the importance of taking [his] rest breaks and meal breaks on time"); Doc. # 39-8 ("Haynes Depo.") at 346:3-15 (reviewing a performance report that reprimanded her for not meeting her break "adherence goal"), Doc. # 39-6 ("Booten Depo") at 223:4-18 (describing being "coached" for taking breaks that were too short), 227:6-228:22 (describing receiving feedback forms instructing her to take her full 15-minute rest breaks); Appendix of Declarations, Ex. 11 at Garcia Decl. at ¶ 13 (describing monetary incentives for taking timely breaks), Maldonado Decl. at ¶ 13 (same).]

2016) ("[T]he lack of a uniform policy or practice actually supports denial of class certification because the question of why an employee did not timely take a meal break is not subject to a common answer for all employees or all missed breaks.").

Furthermore, declarations from many other dispatchers stating that they always took their required meal and rest breaks and were aware of no such *de facto* policy indicate that individualized inquiries are necessary to determine which dispatchers may have been denied breaks as a result of Defendants' conduct.  Appendix of Declarations, Ex. 11 at Adkison Decl. at ¶¶ 3-9, Avelar Decl. at ¶¶ 3-12, Castorena Decl. at ¶¶ 3-5, 7-10, Clavel Decl. at ¶¶ 3-11, Garcia Decl. at ¶¶ 3-7, 9-13, Gutierrez Decl. at ¶¶ 3-7, 10-13, Maldonado Decl. at ¶¶ 3-7, 9-13, Mendoza Decl. at ¶¶ 3-13, Reyes Decl. at ¶¶ 3-11, 15, Ignacio Decl. at ¶¶ 3-10, 12-19, Salino Decl. at ¶¶ 3-11.  Therefore, even assuming the *de facto* break policy applied to some dispatchers, determining which of the 300-plus dispatchers were injured by it would require specially tailored inquiries into which dispatchers missed breaks and whether they did so of their own accord or due to the alleged *de facto* policy.  These individualized issues would undoubtedly predominate over common questions.

It is true that California courts, after *Brinker*, have held that an employer's submission of declarations tending to show the absence of an unlawful unwritten policy, *without more*, "do[es] not preclude class certification."  *Alberts v. Aurora Behavioral Health Care*, 241 Cal. App. 4th 388, 409 (2015) (citing *Hall v. Rite Aid Corp.*, 226 Cal. App. 4th 278, 171 (2014)) ("In *Brinker*'s wake, courts have repeatedly found that a defendant employer's evidence of an inconsistent application of an illegal policy to be *insufficient on its own* to defeat class certification.") (emphasis added).  But *Alberts*, and cases like it, fail to save Plaintiffs' claim for two reasons.  First, Defendants' dispatcher declarations are not "on their own"—they bolster substantial other evidence, cited above, that there was no uniformly-applied *de facto* break-denial policy that affected all El Segundo dispatchers.  Instead, Defendants' evidence suggests that they went to great lengths to ensure compliance with the formal break policy.

Second, the *Alberts* court discussed class certification under California law, not Rule 23. *Id.* at 397 (analyzing class certification requirements under California Code of Civil Procedure section 382 and California Supreme Court precedent). Plaintiffs cite no federal authority that precludes courts from considering for Rule 23 purposes declarations submitted by an employer that contradict class plaintiffs' allegations, nor do the California cases on which Plaintiffs rely.[6] Those cases, therefore, do not change the Court's conclusion that individualized issues predominate under Rule 23. *See, e.g., Washington v. Joe's Crab Shack*, 271 F.R.D. 629, 641 (N.D. Cal. 2010) ("In the absence of any common policy, an individualized inquiry will be required to determine whether any single employee failed to take a meal break because he/she was too busy . . . . For this reason alone, common issues do not predominate with regard to the meal break claim.").

Plaintiffs also cite *Jimenez v. Allstate Ins. Co.* for the proposition that the Ninth Circuit has approved of certifying classes on the "policy-to-violate-the-policy" theory they advance here. 765 F.3d 1161, 1166 n. 5 (9th Cir. 2014), *cert. denied*, 135 S. Ct. 2835 (2015). But courts do not grant class certification in every instance where the plaintiffs simply allege an informal policy to violate California wage-and-hour law. *See Flores v. Supervalu, Inc.*, 509 F. Appx. 593 (9th Cir. 2013) (affirming district court decision declining certification of class action alleging wage-and-hour violations). Much depends on the evidentiary record.

The distinguishing factor between *Jimenez* and *Flores* "appears to be the amount of evidence presented to support the existence of an unofficial policy. In other words, common issues predominate in those cases where the plaintiff proffers sufficient evidence to demonstrate that an unofficial policy exists and applies uniformly to all class members." *Campbell v. Vitran Express Inc*, 2015 WL 7176110, at *7 (C.D. Cal. Nov. 12, 2015). The *Vitran Express* court certified a class when the plaintiffs submitted declarations from roughly 10% of the putative class stating that the employer implemented and uniformly applied an informal policy to deprive them of meal and rest breaks. *Id.* at *8. In similar

---

[6] Indeed, *Alberts* recognized that "[c]lass certification is essentially a procedural [question]." *Alberts*, 241 Cal. App. 4th at 388. This, of course, means that in federal courts, federal procedural standards control.

circumstances, it appears that courts regularly certify classes. *Id.* at \*7 (citing cases).  Here, on the other hand, Plaintiffs have not submitted enough evidence to demonstrate a uniformly-applied unofficial policy—Plaintiffs' depositions do not adequately demonstrate that the *de facto* policy caused them not to timely take their breaks.  And the only declarations in the record from other employees are Defendants' dispatcher declarations, which state in concert that no such *de facto* policy existed.

Plaintiffs' claims that Defendants failed to pay missed-break penalty premiums suffer from the same deficiencies.  Plaintiffs themselves testified that they received such premiums and that no one prohibited them from taking second meal breaks.[7]  Geiger Depo. at 187:3-188:10 (reviewing time and pay records that indicate receipt of multiple penalty premiums); Gomez Depo. at 74:1-75:12 (same); Haynes Depo. at 320:10-324:24 (same); Geiger Depo. at 240:22-241:21.  And a host of dispatchers declared either that they were never forced to miss or delay a break, or that they always received the required premium payments on the rare occasions when they did miss or delay a break.  Appendix of Declarations, Ex. 11 at Adkison Decl. at ¶¶ 6, 11, Avelar Decl. at ¶¶ 5, 14, 29, Castorena Decl. at ¶¶ 6, 11, Clavel Decl. at ¶¶ 3, 13, 16, Garcia Decl. at ¶¶ 14, 17, 26, Gutierrez Decl.

---

[7] At oral argument, Plaintiffs argued that the Court should certify the second meal period sub-class because Defendants employed the following written policy: "Management may authorize a reduced meal period.  However, an employee may not 'work through' or waive his/her right to mealtime or break periods; full-time employees must take a rest period of at least ten minutes for each four-hour work period."  [Doc. 38-7 at 10.]  Their theory appears to be that because the policy states dispatchers may not waive their meal breaks, and time records show that many dispatchers failed to take timely second meal breaks, Defendants must have had a policy of unlawfully preventing them from both taking and waiving their second meal periods.

That argument fails for two reasons.  First, an equally fair reading of the policy is that the phrase "employee[s] may not 'work through'" meal periods means that Defendants forbade dispatchers from missing meal breaks altogether.  Under that reading, the mere fact that dispatchers missed second meal breaks despite a written policy that prevented them from doing so, without a showing of *why* they missed the breaks, is insufficient to survive certification scrutiny.  Second, Defendants' dispatcher declarations state in clear terms that dispatchers *were* allowed to waive their second meal breaks and, in fact, did so regularly.  *See* Adkison Decl. at ¶ 11; Avelar Decl. at ¶ 18; Castorena Decl. at ¶ 11; Clavel Decl. at ¶ 16; Garcia Decl. at ¶ 17; Gutierrez Decl. at ¶ 17; Maldonado Decl. at ¶ 17.  Even if these regular second meal break waivers violated the portion of Defendants' written policy that prevented employees from waiving meal breaks, they did not violate the law.  Indeed, California Labor Code section 512—the section under which Plaintiffs bring their meal break claims— states that an employee's "second meal period may be waived by mutual consent of the employer and the employee" if the employee does not waive the first meal period.  Even if Plaintiffs could surmount the individualized issues that abound, the Court cannot certify a class based on violations of Defendants' company policies alone.  Plaintiffs' argument is therefore unavailing as to the second meal period waivers.

-14-

at ¶ 17, Maldonado Decl. at ¶ 14, Reyes Decl. at ¶ 20, Ignacio Decl. at ¶ 17, Salino Decl. at ¶ 22.  This evidence suggests that any policy—to the extent it existed—was not uniformly applied and that individualized inquiries as to whom it affected would predominate.  In sum, the evidentiary record before the Court does not support a finding of commonality or predominance necessary to certify the meal and rest break classes.

### ii.     Part of Plaintiffs' Off-the-Clock Claim Satisfies the Typicality, Commonality, and Predominance Requirements[8]

Plaintiffs claim that Defendants failed to pay putative class members for time spent starting up and shutting down their computer stations and various software programs before they were able to electronically clock in for their shifts.  Similar to their meal and rest break claims, Plaintiffs contend that this "off-the-clock" work resulted in Defendants' failure to provide accurate wage statements and to timely furnish separation wages when Plaintiffs' employment ended.

Plaintiffs' off-the-clock theory is two-pronged.  They claim that Defendants failed to pay them for:  (1) time spent booting up and shutting down their computers, and (2) time spent opening and closing necessary software programs.  The present record allows the Court to certify the off-the-clock class under the first prong, but not the second.

### a.     Booting Up and Shutting Down Computers

Plaintiffs' theory regarding time spent booting up and shutting down computers clearly yields a common issue:  whether Defendants paid dispatchers for time they spent turning on their workstations before clocking in and turning off their workstations after clocking out.  Defendants cannot dispute that this question applies uniformly to all dispatchers at the El Segundo location because, as a matter of common sense, dispatchers

---

[8] Plaintiffs define their "off-the-clock sub-class" as:

All Class Members who, at any time in the 4 years preceding the filing of this lawsuit through the date of final disposition or final judgment in this action, were not compensated for time spent booting up and shutting down computer software before and after their reported work times, resulting in work performed off-the-clock.

Notice of Motion at 3.

cannot clock in using Kronos until they have booted up their computer and logged in. *See* Solis Depo. at 121:19-23 (stating that it is not possible for dispatchers to clock in using Kronos until they have booted up their computer and opened the program). Nor can they turn their computers off before clocking out. In this respect, all Plaintiffs and class members were subject to a uniform policy or practice.

This prong also satisfies the typicality requirement. That claim, and the injury it alleges, is the same for every dispatcher. No dispatcher could clock in before turning on her computer or clock out after turning it off. Put differently, the conduct giving rise to the off-the-clock claim, to the extent it pertains to the boot up/shut down prong, is not unique to any class member.

Defendants argue that individualized inquiries still predominate because there is no consistent estimate of the amount of time it takes dispatchers' computers to turn on or shut off. Class Cert. Opp. at 21. But courts faced with disparate estimates of the time it takes to complete "work activities may consider estimates and averages, as opposed to calculating by individual employee." *Moore v. Ulta Salon, Cosmetics & Fragrance, Inc.*, 311 F.R.D. 590, 618 (C.D. Cal. 2015); *Maciel v. City of Los Angeles*, 569 F. Supp. 2d 1038, 1052 (C.D. Cal. 2008) (considering an average when "an average range of how long the activity takes [was] reasonably discernable").[9]

Defendants also argue that whatever the amount of time it takes dispatchers to boot up and shut down their computers, that time is *de minimis* and therefore "not compensable." Class Cert. Opp. at 21 (citing *Troester v. Starbucks Corp.*, 5 Cal. 5th 829, 855 (2018) (Kruger, J. concurring), *as modified on denial of reh'g* (Aug. 29, 2018)); *see also Cervantez v. Celestica Corp.,* 618 F. Supp. 2d 1208, 1218 (C.D. Cal. 2009) (holding that time spent waiting in a security line before work was *de minimis* and not compensable); *Carrington v. Starbucks Corp.*, No. D072392, 2018 WL 6695970, at *11 (Cal. Ct. App. Dec. 19, 2018) (discussing whether certain employee activities were "so irregular or brief in duration that

---

[9] Even to the extent that some class members may have restarted their computers at the end of their work day, obviating the need to turn their computer on the following day, Defendants admit that this process could take 1-3 minutes. Cond. Cert. Opp. at 6.

employers may not be reasonably required to compensate employees for the time spent on them" under the *de minimis* doctrine as explained by *Troester*).  Plaintiffs respond that the *de minimis* doctrine does not apply to California wage and hour claims.  Class Cert. Reply at 10-11 (also citing *Troester*, 5 Cal. 5th at 833).

This dispute, however, goes to the merits of Plaintiffs' claims, not whether the Court should certify them.  Once the parties establish an average estimate for how long the boot up/shut down process takes, the Court will be able to determine whether that amount of time is large enough to be compensable on a classwide basis.  *Rai v. Santa Clara Valley Transportation Auth.,* 308 F.R.D. 245, 260–61 (N.D. Cal. 2015) ("the *de minimis* defense can be resolved on a class-wide basis even if the amounts of time for which each representatives and class member seek compensation differ").

Defendants also contend that Plaintiffs were able to email their supervisors with requests to adjust their timecards to include unrecorded time.  Class Cert. Opp. at 19.  While at least two Plaintiffs stated that they could not recall any instances of supervisors denying such requests, Geiger Depo at 127:11-14; Gomez Depo. at 151:6-16, Defendants have not cited any examples of Plaintiffs submitting adjustment requests to account for daily time spent booting up and shutting down/restarting computers.  The instances where Plaintiffs appeared to request adjustments related to their workstations were for missed time stemming from "computer problems" or when the "computer froze."  Geiger Depo at 237:17-238:3; Booten at 107:22-108:25.  These passages are not enough to show that individualized inquiries predominate because it does not appear that this time correction procedure was available for corrections to account for routine daily boot up and shut down time.

This portion of Plaintiffs' off-the-clock theory presents common issues that predominate over the individualized inquiries.  Certification is therefore appropriate on this theory.

**b.    Opening and Closing Software Programs**

On the other hand, the evidence does not indicate that, on a classwide basis, dispatchers were subject to a policy requiring them to open up necessary software programs before logging in and to close them before logging out.  As a result, individualized inquiries into which dispatchers clocked in before opening up programs and clocked out before closing them would predominate over any common questions.

Some Plaintiffs testified that they opened and closed programs off the clock.  *See e.g.,* Haynes Depo. at 297:7-9 (stating she clocked out before closing programs); Gomez Depo. at 133:20-135:3 (stating vaguely that the "supervisors" told her to load programs before clocking in, but stating she was unable to remember names).  But another testified, when confronted with her computer activity records that showed her consistently clocking in before opening other programs, that her "general routine" was to clock in before starting other programs.  Booten Depo. at 97:23-94:4.  And Booten's testimony is consistent with that of Solis and the other dispatchers who submitted declarations.  Solis Depo. at 120:15-121:9 (stating that dispatchers clock into Kronos and "then they would start to launch the rest of their tools"); Appendix of Declarations, Ex. 11 at Adkison Decl. at ¶ 14 (clocks in and loads other programs "simultaneously"), Avelar Decl. at ¶ 23 (clocks in before loading other programs), Castorena Decl. at ¶¶ 14, 16 (clocks in before loading other programs and clocks out after closing programs), Clavel Decl. at ¶¶ 21, 24 (clocks in before loading other programs and clocks out after closing programs), Garcia Decl. at ¶¶ 19, 22 (clocks in and loads other programs "simultaneously" and closes Kronos last), Gutierrez Decl. at ¶¶ 22, 27 (clocks in before loading other programs, closes Kronos last), Maldonado Decl. at ¶¶ 22, 26 (clocks in before loading other programs, closes Kronos last), Mendoza Decl. at ¶¶ 20, 24 (clocks in before loading other programs and closes Kronos last), Reyes Decl. at ¶¶ 27, 33 (clocks in before loading other programs and closes Kronos last), Ignacio Decl. at ¶¶ 24, 30 (clocks in before loading other programs and closes Kronos last).

Therefore, even assuming that Haynes clocked out before closing other programs and Gomez's supervisors told her repeatedly to log into other programs before clocking in,

their experiences appear to be different from other class members and even other Plaintiffs. Such a key dissimilarity precludes a finding of commonality among the class members. *See Dukes*, 564 U.S. at 350.  It also indicates that the individualized inquiries necessary to determine which supervisors told which dispatchers to open other programs before clocking in (and which dispatchers actually did so) would predominate over common questions.  The Court declines to certify the off-the-clock subclass to the extent it pertains to claims for opening and closing computer programs.

### 4.    Superiority

The "superiority" prong of Rule 23(b) requires the Court to consider:  (1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3)(a)-(d).

Nothing in the record suggests that class members have any individual interest in controlling the prosecution or defense of separate actions.  The Court is unaware of any other ongoing litigation involving the class members.  Nor is the Court aware of any management difficulties that would make individual actions preferable to class treatment. Moreover, this forum is desirable because it encompasses the call center where the alleged violations took place.  Class treatment of the boot up/shut down off-the-clock claim is therefore superior to individual actions.

## C.    Conclusion

Since Plaintiffs' off-the-clock theory may proceed on a class basis to the extent it pertains to time spent booting up and shutting down computers, their derivative classes— the itemized wage statement and waiting time penalties subclasses—may also proceed on a class basis under that theory.  The Court therefore **GRANTS** in part and **DENIES** in part Plaintiffs' Motion for Class Certification, and certifies the overall class as to the off-the-

clock, the itemized wage statement, and the waiting time penalties claims.  The Court sees no need for sub-classes given the interrelationship of the claims certified.

### III.

### CONDITIONAL CERTIFICATION MOTION

Plaintiffs have also moved the Court to conditionally certify a collective action under 29 U.S.C. § 216(b).  Their collective action definition is:

> [a]ll persons who were employed by Defendants (one or more of them) at Defendants' El Segundo, California dispatch center as a non-exempt dispatcher and who are owed wages and/or penalties for unpaid overtime hours worked in excess of 40 hours in a workweek at any time within the three years preceding the filing of this lawsuit through the date of disposition.

Cond. Cert. Mot. at 1.  Plaintiffs' theory is that the same off the clock violations discussed above—booting up and shutting down their computers off the clock, and opening and closing necessary programs off the clock—resulted in Defendants failing to pay dispatchers owed overtime premiums.  *Id.* at 1.

### A.   Legal Standard

Section 216(b) of the FLSA states that employees may file suit against their employers on their own behalf or on behalf of "other employees similarly situated."  29 U.S.C. § 216(b).  The statute does not define "similarly situated," and, until recently, the Ninth Circuit had provided no guidance on the subject.  Without controlling guidance, district courts have historically employed a two-step approach.  *See Kress v. PricewaterhouseCoopers, LLP*, 263 F.R.D. 623, 627 (E.D. Cal. 2009); *Mitchell v. Acosta Sales, LLC*, 841 F. Supp. 2d 1105, 1115 (C.D. Cal. 2011).  The first step, which typically occurred during the pleading stage, was the "notice stage," during which courts determine whether "employees are sufficiently similarly situated that notice should be sent to prospective plaintiffs."  *Kress*, 263 F.R.D. at 627.  The analysis at this first stage was

"lenient," and "usually result[ed] in conditional certification of a representative class." *Id.* (citing cases).

The second stage usually occurred "[a]fter discovery [was] complete and the case [was] ready for trial." *Mitchell*, 841 F. Supp. 2d at 1116.  During this "decertification stage," courts conducted a more rigorous inquiry into whether the plaintiffs were similarly situated "based on the following factors:  (1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to the defendants with respect to the individual plaintiffs; and (3) fairness and procedural considerations." *Id.*

The Ninth Circuit's recent decision in *Campbell v. City of Los Angeles*, however, upended the traditional district court FLSA certification analysis, rejecting both the majority and minority approaches to examining the statute's "similarly situated" requirement.  903 F.3d 1090, 1119 (9th Cir. 2018).  The court stated that the "similarly situated" analysis, on which both stages' analyses turn, more appropriately focuses on whether collective plaintiffs are "alike with regard to some material aspect of their litigation." *Id.* at 903 F.3d at 1114.  What matters in a collective action, the court explained, "is not just any similarity between party plaintiffs, but a legal or factual similarity material to the resolution of the party plaintiffs' claims, in the sense of having the potential to advance these claims, collectively, to some resolution." *Id.* at 1115.  The result is a standard that is far more forgiving than the one California district courts previously employed and is not synonymous with the Rule 23 class action certification analysis.

*Campbell* preserved the two-step approach, but emphasized that "managing a collective action—the form and timing of notice, the timing of motions, the extent of discovery before decertification is addressed—is largely a question of case management, and thus a subject of substantial judicial discretion." *Id.* at 1110 (internal citations omitted).

The first-stage analysis, which *Campbell* stated should take place "at or around the pleading stage," is "typically focused on a review of the pleadings but may sometimes be supplemented by declarations or limited other evidence." *Id.* at 1109.  This is still a "lenient" inquiry and is "loosely akin to a plausibility standard, commensurate with the

stage of the proceedings." *Id.* The "sole consequence" of a successful preliminary certification motion is "the sending of court-approved written notice" to workers who "may wish to join the litigation as individuals." *Id.* at 1101.

If the collective action "survive[s] its earlier scrutiny," the second-stage inquiry "will come at or after the close of relevant discovery." *Id.* at 1110. As before, the second-stage constitutes a "more exacting look at the plaintiffs' allegations and the record." *Id.* Members of a collective action are "similarly situated, and may proceed in a collective, to the extent they share a similar issue of law or fact material to the disposition of their FLSA claims." *Id.* at 1117. District courts may decertify collective actions at the second stage when "conditions make the collective mechanism truly infeasible, but [they] cannot reject the party plaintiffs' choice to proceed collectively based on [their] perception of likely inconvenience." *Id.* The court analogized this inquiry to the Rule 23 commonality inquiry as announced by *Dukes*, but cautioned that, more broadly, Rule 23 standards are inapplicable in the FLSA context. *Id.* at 1114-15.

Furthermore, in cases where "decertification overlaps with the merits of the underlying FLSA claim," courts must now decide decertification motions using the federal summary judgment standard. *Id.* at 1117. The court reasoned that because the decertification examination should take place after discovery closes and requires evidentiary evaluation, merits-focused decertification motions are effectively "indistinguishable" from summary judgment motions. *Id.* at 1117-19.

**B.    Discussion**

The parties ignore *Campbell* entirely in their briefing. Instead, Plaintiffs argue that pre-*Campbell* district court authority requires that the Court consider only the first-step notice inquiry and Defendants argue that competing district court decisions allow the Court to skip to the more rigorous second-stage inquiry and deny certification. The reality is that this case is at a hybrid stage – given the amount of class certification

discovery that has been done, it is neither at the pleading stage nor at the decertification stage.

### 1.    The First-Stage Analysis Applies

Because the merits of Plaintiffs' FLSA claim overlap to some extent with the certification (or decertification) question—just like they overlapped to a certain extent with Plaintiffs' claims under the Rule 23 analysis—the Court must employ the summary judgment standard to conduct the second-stage analysis. While the pre-certification discovery window has already closed, Cond. Cert. Opp. at 8-9, [Doc. # 36], the non-expert and expert discovery cut-offs in this case are not until March 19 and June 4, 2019, respectively. [Doc. # 21-1.] Plaintiffs also list the discovery that they have yet to complete and describe several ongoing discovery disputes. Cond. Cert. Reply at 4.

Forcing the parties to litigate what is essentially a summary judgment motion without the benefit of having completed discovery would be prejudicial to both sides. Nor have the parties properly briefed the issues applying the summary judgment standard. Under these circumstances, the Court declines to skip the first stage—to the extent district courts may still do so after *Campbell*—and proceed straight to the second stage.

*Campbell* noted that courts may abuse their discretion by decertifying too early, decertifying too late, or "refusing to allow notice to putative collective action members." *Campbell*, 903 F.3d at 1110 (quoting *Woods v. N.Y. Life Ins. Co.,* 686 F.2d 578, 580 (7th Cir. 1982), for the proposition that "in a valid collective action, 'forbid[ding] the sending of notice altogether' would be an abuse of discretion.")). Insofar as Plaintiffs have satisfied the stage-one requirements as discussed below, notice is appropriate.

### 2.    Plaintiffs Have Made a Sufficient Stage One Showing

Given that the first-stage inquiry is "lenient" and akin to an adequacy of the pleadings determination, Plaintiffs have satisfied it. The Court interprets *Campbell* to effectively preclude any meaningful inquiry into the evidence at the notice stage. *Campbell*, 903 F.3d at 1109 (the court's examination of the pleadings "may sometimes be supplemented by declarations or limited other evidence.") (citing Fed. R. Civ. P. 12(b)(6);

*Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).  Plaintiffs' pleadings are sufficient to state plausible FLSA claims.

Accordingly, in recognition of the fact that the parties will have another opportunity to litigate FLSA certification at stage two after discovery closes, the fairest and most effective way to manage the case is to grant Plaintiffs' conditional certification motion. The parties can renew their merits-overlapping arguments under *Campbell*'s stage-two summary judgment standard.

The parties are hereby ordered to meet and confer regarding an appropriate schedule for facilitating notice to potential opt-in plaintiffs, completing previously-scheduled discovery, and completing any additional discovery relating to opt-in plaintiffs who decide to join the action.  They shall file a joint report regarding those meet and confer efforts no later than seven days from the date of this Order.

### 3.    Defendants' "Failsafe Class" Argument Fails

Defendants also argue that the Court must deny certification because Plaintiffs' collective action definition amounts to a "failsafe class."  But the Ninth Circuit has strongly indicated that it is not inclined to decline certification on a failsafe class theory.  *Melgar v. CSK Auto, Inc.*, 681 F. App'x 605, 607 (9th Cir. 2017) ("We further note, though we do not hold, that our circuit's caselaw appears to disapprove of the premise that a class can be fail-safe.") (citing *Vizcaino v. United States District Court*, 173 F.3d 713, 721–22 (9th Cir. 1999); *see also Makaron v. Enagic USA, Inc.,* 324 F.R.D. 228, 235 (C.D. Cal. 2018) ("The Ninth Circuit has yet to opine on the propriety of failsafe classes.").  Nor have Defendants cited any authority that imports the failsafe class theory into the FLSA collective action analysis.  The Court refuses to do so here, given *Campbell*'s explicit instructions to treat Rule 23 certification and FLSA certification differently.  Accordingly, Defendants' failsafe class argument does not prevent conditional certification.

### 4.      Plaintiffs' Collective Action Must Be Redefined

Finally, Defendants contend that Plaintiffs wrongly define their collective action to include all workers who have suffered an injury within three years of the filing of the Complaint.  Cond. Cert. Opp. at 20-21.  They argue that the statute of limitations in FLSA cases continues to run until a valid consent to participate in the action is filed.  29 U.S.C. § 256; *Partlow v. Jewish Orphans' Home of S. California, Inc.*, 645 F.2d 757, 760 (9th Cir. 1981), *abrogated on other grounds by Hoffmann-La Roche Inc. v. Sperling,* 493 U.S. 165 (1989).  The cases they cite, however, do not support the outright denial of conditional certification for all potential collective action members.  Rather, they indicate that courts deny certification or grant summary judgment against those plaintiffs whose claims have in fact expired.  *See Gessele v. Jack in the Box, Inc.,* 6 F. Supp. 3d 1141, 1157 (D. Or. 2014), *as amended* (May 15, 2014) (*quoting Harkins v. Riverboat Servs., Inc.,* 385 F.3d 1099 (7th Cir.2004) (dismissing claims of 18 of 21 FLSA plaintiffs for failure to opt in within the statutory period).

Accordingly, to avoid sending potential plaintiffs misleading notices and to avoid unnecessary disputes over the statute of limitations in the future, the Court hereby amends the FLSA collective action definition to include:

> Any person who was employed by Defendants (one or more of them) at Defendants' El Segundo, California dispatch center as a non-exempt dispatcher and who is owed wages and/or penalties for unpaid overtime hours worked in excess of 40 hours in a workweek at any time within the three years preceding the date that such person files a written consent to become a party plaintiff in this action, *Geiger, et al. v. Charter Communications, Inc., et al.*, Case No. CV 18-158-DMG (GJSx).

**IV.**

**CONCLUSION**

In light of the foregoing, the Court issues the following rulings:

1. Plaintiffs' Motion for Class Certification is **GRANTED in part** and **DENIED in part** as follows:

   a. The Court certifies the following class with regard to the booting up/shutting down off-the-clock, wage statement, and waiting time penalty claims, as defined in this Order:

      i. All persons who, at any time in the 4 years preceding the filing of this lawsuit through the date of final disposition or final judgment in this action, are/were employed by Defendants (one or more of them) as a non-exempt dispatcher in Defendants' El Segundo, California office ("Class Members");

   b. The Court declines to certify the following classes:

      i. The late meal period sub-class;

      ii. The second meal period sub-class;

      iii. The rest period sub-classes; and

      iv. The off-the-clock sub-class relating to the opening and closing of software programs;

   c. The Court appoints Louis Geiger, Christina Gomez, Amanda Haynes, and Gara Booten as representatives of the certified class described above;

   d. The Court appoints Rhonda H. Wills, of the Wills Law Firm, PLLC, and George P. Moschopolous, of the Law Office of George Moschopolous, APC as class counsel;

2. Plaintiffs' Motion for Conditional Certification Under the FLSA is **GRANTED**, with the following modified definition of the collective action:

   a. Any person who was employed by Defendants (one or more of them) at Defendants' El Segundo, California dispatch center as a non-exempt dispatcher and who is owed wages and/or penalties for unpaid overtime hours worked in excess of 40 hours in a workweek at any time within the three years preceding the date that such person files a written consent to become a party plaintiff in this action, *Geiger, et al. v. Charter Communications, Inc., et al.*, Case No. CV 18-158-DMG (GJSx); and

3. The parties shall meet and confer regarding a schedule of deadlines for class notice and notice to potential FLSA opt-in plaintiffs, opt-in deadline, and any additional discovery, as described in this Order.  The parties shall also file a written joint status report regarding the meet and confer efforts and the agreed-upon schedule no later than seven days from the date of this Order.

**IT IS SO ORDERED.**

DATED:  January 23, 2019

_____
DOLLY M. GEE
UNITED STATES DISTRICT JUDGE